UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-334 (NEB/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

MUNA WAIS FIDHIN,

Defendant.

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE REGARDING PROPOSED 404(B) WITNESS EVIDENCE**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Matthew C. Murphy, Rebecca E. Kline, and Austin L. Bowyer, Assistant United States Attorneys, respectfully submits the following response in opposition to the Defendant's Motion in Limine Regarding Proposed 404(b) Witness Evidence.

**INTRODUCTION & BACKGROUND**

On Friday, September 25, 2026, federal law enforcement interviewed an individual whose name and date of birth appeared on a list of children that defendant Muna Fidhin submitted via email to Partners in Nutrition on November 18, 2021. (Gov't Ex. F-42). The list purported to show children to whom the defendant had provided food to at her nonprofit entity, M5 Care, as part of the food program.

During the interview, the individual stated that she had never heard of M5 Care or Muna Fidhin and did not receive food from either. Law enforcement also interviewed the individual's mother—whose name also was included on the roster—

and she corroborated Individual 1's statement. That same day, the government disclosed the interview reports to defense counsel.

The following Monday, at the September 28, 2026, pretrial conference, the defendant objected to Individual 1 and Individual 2's proposed testimony as late disclosed Rule 404(b) evidence. At the same time, the defendant indicated for the first time that she would similarly object to the government's introduction of all evidence relating to her participation in the Federal Child Nutrition Program under the sponsorship of Partners in Nutrition. Because the defendant's newly raised objection would implicate a significant amount of the government's proposed exhibits and witness testimony,[1] the Court ordered the defendant to file a Motion in Limine.

The defendant's motion clarifies her position. She asserts that, regardless of what is alleged in the Indictment, her scheme to defraud the Federal Child Nutrition Program should be viewed as two distinct schemes: one scheme to defraud the Federal Child Nutrition Program under the sponsorship of Feeding Our Future; and another scheme to defraud the Federal Child Nutrition Program under the sponsorship of Partners in Nutrition.

The Indictment clearly articulates the scope of the fraudulent scheme the defendant allegedly participated in between 2020 and 2022. Paragraph 1 alleges that the defendant "participated in a scheme to defraud the federal child nutrition

[1] The government's Trial Brief, filed on September 16, 2026, set out the evidence the government intends to present relating to Ms. Fidhin's participation in the Federal Child Nutrition Program. That evidence includes her participation in the Federal Child Nutrition Program under the sponsorship of Partners in Nutrition. *See* ECF No. 61, pp.10-17. Notably, the defendant made no objection to the introduction of this evidence until the government indicated it would call these two new witnesses to testify.

program by exploiting changes in the program intended to ensure that underserved children received adequate nutrition during the Covid-19 pandemic." (ECF No. 1 ¶ 1.) It alleges that "she enrolled her company, M5 Café, in the federal child nutrition program under the sponsorship of Feeding Our Future" and her other company, M5 Care, under the sponsorship of Partners in Nutrition. (*Id.*) It then alleges that she "fraudulently claimed to be serving meals to 500 children a day, seven days a week, at her *sites*," and "submitted fake invoices [obtained from another individual and entity involved in the scheme] purporting to document the purchase of food for use in feeding these children." (*Id.*, emphasis added.) Paragraph 2 alleges that she "claimed to be entitled to nearly $1 million in federal child nutrition program funds" and then used those funds "to pay off her mortgage and to send tens of thousands of dollars out of the country."

Paragraph 3 goes on to explain the background of the Federal Child Nutrition Program—including how changes made to the program during the Covid-19 pandemic made it vulnerable to fraud and abuse—before alleging that sites sponsored by both Feeding Our Future and Partners in Nutrition participated in the scheme to defraud the Federal Child Nutrition Program by submitting fraudulent reimbursement claims on behalf of their sites. (*Id.* ¶¶ 3(A)-(C.). It then further articulates the defendant's alleged role in the fraudulent scheme, including that she "opened two Federal Child Nutrition Program sites in 2020 and 2021. She opened [the] M5 Café site under and the sponsorship of Feeding Our Future and a site in the name of M5 Care under the sponsorship of [Partners in Nutrition." (*Id.* ¶ 3(D).)

The conduct specifically alleged in Counts 1-3 of the indictment, charging the defendant with wire fraud, is even more explicit as to the defendant's involvement in the scheme across both sites. Paragraph 5 alleges that the defendant "participated in and carried out a scheme to defraud the Federal Child Nutrition Program by fraudulently claiming to have serve free meals to hundreds of thousands of children" and that based on those fraudulent claims she fraudulently "claimed to be entitled to nearly $1 million in Federal Child Nutrition Program funds." (*Id.* ¶ 5.) Paragraphs 6-8 specify that as "*part of her scheme*," the defendant: "applied to enroll M5 Café in the federal child nutrition program . . . under the sponsorship of Feeding Our Future"; fraudulently "claimed to serve 500 children a day, 7 days a week at M5 Café"; and then "submitted fraudulent invoices and receipts purporting to show that she purchased food from Alif Halal." (*Id.*¶¶ 6-8 (emphasis added).) Paragraphs 10 and 11 allege that, through M5 Café's fraudulent claims, the defendant "claimed to be entitled to nearly $600,000 in Federal Child Nutrition Program funds" and received "approximately $550,000." (*Id.*¶ ¶ 10-11.)

Paragraph 12 alleges that, as a further part of her scheme to defraud the Federal Child Nutrition Program, the defendant "created a nonprofit organization called M5 Care" and "applied to open a second Federal Child Nutrition Program site in the name of M5 Care under the sponsorship of [Partners in Nutrition].[2] (*Id.* ¶ 12.) And Paragraph 13 alleges that the defendant "submitted fake invoices from both Alif Halal as well as The Produce LLC" to support her fraudulent claims that she "served

[2] Partners in Nutrition is referred to as Sponsor A in the Indictment.

approximately 170,000 meals at the M5 Care site between November 2021 and February 2022, for which she claimed to be entitled to more than $400,000 in Federal Child Nutrition Program funds." (*Id.* ¶ 13.)

Combining the claims she made through both M5 Café and M5 Care, Paragraph 14 alleges that the defendant "fraudulently claimed to have served more than 300,000 meals at her two food sites, for which she claimed to be entitled to approximately $1 million in Federal Child Nutrition Program funds." (*Id.* ¶ 14.)

Finally, Paragraph 16 alleges that "for the purpose of executing *the scheme described above,*" the defendant "caused the transmission by means of a wire communication in interstate commerce, certain writing, signs, signals, sand sounds, including" the three specific emails to Feeding Our Future. (*Id.* ¶ 16 (emphasis added).)

**ARGUMENT**

Defendant's argument that evidence of her participation in the Federal Child Nutrition Program through the sponsorship of Partners in Nutrition constitutes "improper undisclosed character evidence under Federal Rule of Evidence 404(b)" is baseless. Rule 404(b) concerns itself with evidence of "other crime[s], wrong[s], or act[s]," not with evidence of the crimes charged in the Indictment for which the defendant is on trial. The defendant does not get to define the scope of the scheme. The Indictment does. The defendant's motion should therefore be denied.

18 U.S.C. § 1343 makes it a crime to transmit interstate wire communications *in furtherance* of a scheme to defraud. Thus, the statute requires the government to prove beyond a reasonable doubt both that the defendant devised or participated in

a scheme to defraud *and* that she used interstate wire communications in furtherance of that scheme.

As the Indictment makes clear, the specific wire communications charged represent merely three executions of the defendant's scheme to defraud the Federal Child Nutrition Program, not the totality of her scheme. It also makes clear that her scheme to defraud the Federal Child Nutrition Program continued from October 2020 through February 2022 and encompassed not only M5 Café's participation in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future but also M5 Care's participation under the sponsorship of Partners in Nutrition. (*See id.* at ¶ 18 (alleging the defendant sent the three charged emails "for the purpose of executing" the fraudulent scheme to defraud the Federal Child Nutrition Program described in the preceding paragraphs.) Evidence that the defendant participated in the fraudulent scheme through M5 Care under the sponsorship of Partners in Nutrition therefore is not evidence of another crime. It is, pure and simple, evidence of the crimes for which she is charged and facing trial

This principle was well explained by the Ninth Circuit's analysis in a similar case, *United States v. Loftis*, 843 F.3d 1173 (9th Cir. 2016). There, the defendant was charged with five counts of wire fraud. *Id.* at 1175. The indictment alleged a "broad scheme to defraud, spanning six years, several states and numerous alleged victims." *Id.* The five specific wire communications charged, however, related only to three victims and all related to the "scheme as perpetrated in a single state, Montana." *Id.* The defendant moved in limine to exclude evidence of "victims not specifically named

in the indictment, additional uses of the wires, and aspects of the scheme carried out in states other than Montana." *Id.* The district court sided with the defendant, characterizing the challenged evidence as pertaining to "other wire frauds" that would be excluded under Rule 404(b) "unless the government could show the evidence was either 'inextricably intertwined with the scheme [the defendant] employed in Montana" or else admissible for a one of the permitted purposes enumerated in Rule 404(b). The government filed an interlocutory appeal and the Ninth Circuit ruled that the challenged evidence was "not evidence of 'other' crimes or acts under Rule 404(b), because it [was] evidence of part of the *crime charged* in the indictment—the overall scheme to defraud." *Id* at 1175-76 (holding that the crime of wire fraud "includes not only the specific executions of the scheme alleged as the second element of the offense but also the overall scheme alleged as the first element of the offense.") Because Rule 404(b) only applies to "crimes, wrongs or acts 'other' than those at issue under the pleadings," and the challenged evidence was "part of the charged offense—the fraudulent scheme as a whole", the *Loftis* court ruled that Rule 404(b) simply did not apply to the challenged evidence. *Id.* at 1176 (citing 22B Keneth W. Graham, Jr. *Federal Practice and Procedure* § 5239 (1st ed. 2016).

Here, the defendant seemingly acknowledges this point, but persists that despite what the Indictment alleges, her scheme to defraud the Federal Child Nutrition Program under the sponsorship of Feeding Our Future should be viewed separately and distinctly from her scheme to defraud the federal child nutrition program under the sponsorship of Partners in Nutrition. In her view, because she

was only charged with wires in furtherance of her scheme to defraud the federal Child Nutrition Program under the sponsorship of Feeding Our Future, evidence of her continuing scheme to defraud the Federal Child Nutrition Program under Partners in Nutrition is evidence of "other crimes."

The defendant's argument relies on *United States v. Swinton*, 75 F3d 374 (8th Cir. 1996).[3] In *Swinton*, the defendant was charged with seven counts of bank fraud, each count relating to a different fraudulent residential mortgage applications involving straw purchasers. *Id.* at 376-77. At trial, government sought to introduce evidence of seven other residential mortgage applications not charged in the indictment *Id.* The defendant objected that such evidence was improper "other crimes" evidence, but the district court demurred, ruling that Rule 404(b) did not apply at all "because the evidence tended to prove the existence of the plan, scheme, or artifice for which Swinton was charged." *Id.* at 377. The Eighth Circuit affirmed the district court's ruling.

[3] The defendant's reliance on *United States v. Thomas*, 791 F.3d 889 (2015) is misplaced. In *Thomas*, the defendant overstated her income in four loan applications and was charged with four counts of wire fraud. *Id.* at 892. At trial, the government sought to introduce evidence that, about one year later, the defendant advised her mother-in-law to falsify her income on loan paperwork to secure a loan. *Id. at* 893. The government did not allege that the defendant's false loan applications and her later advice to her mother-in-law to falsify loan documents were part of the same scheme. Instead, it argued it was admissible to show the defendant's intent and lack of mistake with regards to the wire fraud scheme for which she was charged. The Eighth Circuit's decision simply affirmed that was a permissible use under 404(b). *Id.* at 893-95. The *Thomas* decision therefore is not germane to the issue before the Court.

The *Swinton* Court observed that: (1) to prove bank fraud, the government had to "establish that the defendant "knowingly executed (or attempted to execute) a 'scheme or artifice'"; (2) the operable indictment alleged the defendant had engaged in "single scheme to defraud financial institutions" by causing "misrepresentations and false information in the mortgage loan applications and closing documents"; and (3) "where the charged offenses were not isolated acts, but rather, were a part of the series of transactions involving the same principal actors, in the same roles, and employing the same general modus operandi, the various acts may be considered to constitute a single scheme." *Id. Id.* at 378. The *Swinton* Court then analyzed each of the uncharged mortgage applications to determine whether they were part of the same scheme as the charged transactions or were otherwise "'so blended or connected[] with the one[s] on trial as that proof of one incidentally involves the other." *Id.* It ruled that three of the uncharged mortgage applications were "clearly part of the same scheme" because they involved the same straw purchaser, misrepresentations, closing agent, and bank victim as four of the charged counts. *Id.* at 378-79. It ruled that another of the uncharged transactions also "was a part of the overall scheme" because it involved the same straw purchaser and similar misrepresentations as one of the charged transactions. *Id.* at 379. It ruled that two of the remaining three uncharged mortgage applications were "blended or connected to" one of the charged transactions because they tended to prove that the straw purchaser in the charged transaction lied about her residence and source of funds. Finally, it ruled that the final uncharged mortgage application was neither part of

the same scheme nor blended with a charged count because it the government did not show it involved a straw purchase or otherwise allege any of the representations in the application were false.

Applying the same level of analysis to the facts of this case shows that the defendant's fraudulent claims on behalf of M5 Care are part of the same scheme as her fraudulent claims through M5 Café, even though the two companies submitted claims through different sponsors. The defendant, as the sole owner of both M5 Café and M5 Care, was the principal actor defrauding the Federal Child Nutrition Program through both M5 Café and M5 Care (same principal in the same role). In both instances, she caused the submission of fraudulent meal reimbursement claims by preparing and signing fraudulent meal counts which alleged that she had served food to large numbers of children at her sites, seven days a week (same misrepresentation). In both instances, she obtained and submitted fake receipts from Alif Halal to support her fraudulent reimbursement claims, by making it appear she had purchased vast amounts of food (same modus operandi). In both instances, she wrote checks to Hoda Abdi (the owner of Alif Halal) to further make it appear she purchased food, only to have Hoda Abdi give her the money right back (same modus operandi). The minor distinction that the defendant submitted a fraudulent roster to Partners in Nutrition but not to Feeding Our Future does not negate that her "modus operandi" for defrauding the Federal Child Nutrition Program was the same under the sponsorship of Feeding Our Future and Partners in Nutrition. Finally, the defendant incorporated M5 Care in February 2021, at the time she was operating M5

Café under the sponsorship of Feeding Our Future. She first sought to enroll M5 Care in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future, in order to continue her fraud after M5 Café's eligibility in the Federal Child Nutrition Program ended. Several months later, in October 2021, she transferred M5 Care's participation in the Federal Child Nutrition Program from Feeding Our Future to Partners in Nutrition. M5 Care's participation in the Federal Child Nutrition Program under Partners in Nutrition therefore was purely a continuation of the fraudulent scheme she started under the sponsorship of Feeding Our Future. *See United States v. Sayakhom*, 186 F.3d 928, 937-38 (9th Cir. 1999) (where the defendant was charged with mail fraud arising from her unauthorized sale of life insurance products through a company called AAC, evidence that the defendant continued to sell unauthorized life insurance products through a company called MAPS constituted intrinsic evidence of the charged mail fraud scheme because "AAC and MAPS were part of an ongoing scheme to defraud"); *United States v. Hall*, 604 F.3d 539 (8th Cir. 2010) (where the defendant solicited victims to invest in a fraudulent real estate investment trust between 2003 and 2006 and then solicited different investors in a different state to invest in a different, fraudulent currency investment trust between 2006 and 2007, evidence related to the first trust was properly admitted even though the charged mail and wire counts related only to the second trust, because "the two trusts were integral parts of the same fraudulent scheme"). The evidence of the defendant's submission of fraudulent claims to

Partners in Nutrition is not 404(b), "other acts" evidence. Because of that, there is no basis to exclude it from the government's case.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion. It should permit the government to present evidence of the fraudulent scheme alleged in the Indictment regardless of the specific emails that were charged as executions of that scheme.

Dated: October 2, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

/s/ *Matthew C. Murphy*
BY: MATTHEW C. MURPHY
REBECCA E. KLINE
AUSTIN L. BOWYER
Assistant United States Attorneys